The opinion of the court was delivered by
Manning, C. J.
The City of New Orleans sues the Southern Bank, and Thomas Layton, and Antoine Dubuclet in solido for eight hundred and five thousand dollars of City Bonds, with all the attached coupons for twenty five years representing seven per centum per annum interest from March 1,1869; or in case that the Bonds and coupons cannot be returned, that the defendants be condemned in solido to pay the princi *561 pal, with seven per centum interest annually from the above date for twenty five years. The case was tried by a special jury.
A verdict having been rendered for eighty four thousand three hundred and twenty three dollars and eighty four cents against the Bank and A. Dubuclet in solido, and of one hundred and fifty dollars against Thomas Layton, judgment was rendered accordingly, and the Bank and Dubuclet have appealed.
The cause of action was this ; — that by Act of the General Assembly, approved February 27, 1869, the City of New Orleans was empowered to issue bonds to the amount of two millions of dollars, payable twenty five years after date, and bearing seven per centum per annum interest,, to enable it to fund and liquidate the balance of its floating debt, existing at that date, such as judgments, outstanding warrants, etc., which bonds, when issued, were to be deposited with the Fiscal Agent, exclusively in payment at par of debts then due by said City, other than those evidenced by Oity notes; a full and particular statement of which debts should be prepared by the Comptroller and Treasurer of the City, verified by the Mayor and the members of the Finance committees, of the Boards of Aldermen and assistant Aldermen; which statement, so verified and attested, should be furnished to the Fiscal Agent; and “it shall be the duty of the Fiscal Agent to give said bonds at par in payment of the debts of the City to the creditors mentioned in said statement, or to their heirs or assigns” — that the Southern Bank was before, and at, that date the Fiscal Agent of New Orleans, and continued to be until during October, 1869, and the bonds thus provided for were issued and deposited with that Bank, and that eight hundred and five thousand dollars of them have been illegally and wrongfully retained, disposed of, or paid out by the Bank and others in this way;—
Under the Act, approved September 14,1868, the Board of Commissioners of the Metropolitan Police apportioned and assessed against the City of New Orleans for the year ending October 1,1869, the sum of eight hundred and five thousand six hundred and thirty five dollars, to be raised by taxation, and to be paid to the State Treasurer for that Police, and the provisions of that Act were reenacted on March 8,1869. In July 1869, the Common Council of New Orleans adopted an ordinance authorizing the proper officers to issue eight hundred and five thousand dollars of the two million of bonds, to be disposed of under such rules as the Finance Committees and the Mayor might establish, provided the bonds so issued be given by the Fiscal Agent at par in payment to such creditors of the City as should be determined by those Committees and the Mayor were within the purview of the Act. On July 15,1869 these Finance Committees, contrary to the requirements of the Act of February 27,1869, determined to use a portion of the bonds deposited *562 with the Riscal Agent to pay the Metropolitan Police apportionment, and accordingly resolved that the Riscal Agent should pay to the State Treasurer the bonds referred to in the Ordinance of July, for the purpose of paying that apportionment, with the same proviso that was contained in the Ordinance, viz that such payment of these bonds to the State Treasurer be made at par, and no discount should be allowed on them, and with the further proviso that the receipt of the Treasurer shall stipulate that no discount on the bonds is to be made, and that none of them shall be paid to the Treasurer until he shall have been legally authorized to receive them, by resolution of the Metropolitan Police Board, in full payment of all claims it might have against the City.
This resolution was communicated to the Metropolitan Police Board, and to the Fiscal Agent, on July 16, 1869, and the Board refused to recognise the legality of the action of the Finance Committees, and refused to receive the bonds.
It is then alleged that the Fiscal Agent, despite this refusal of the Board, and contrary to the resolutions of the Finance Committees, arranged with Dubuclet, the State Treasurer, to take these bonds to New York and sell them — the Fiscal Agent making a paper transfer of the bonds to the Treasurer on July 20,1869, and taking his receipt therefor, which receipt, it is alleged, did not conform to the requirements and provisos of the Finance Committees; and immediately thereafter the bonds were taken by Thomas Layton to New York, with Dubuelet’s knowledge and consent, and were sold at a discount of twenty one and one half per centum. Mr. Layton was the President of the Southern Bank.
That with the proceeds of the sale of these bonds, Dubuclet undertook the purchase of Metropolitan Police warrants, and finally about five hundred and thirty seven thousand nine hundred and forty dollars and twenty eight cents in those warrants were paid out of those proceeds.
The plaintiff charges that the Southern Bank, as Fiscal Agent, was specially entrusted with the custody of the City Bonds, and the duty was imposed upon it of not paying them out, except for debts of the City that existed on February 27, 1869, and only for such of those as should appear in a statement of the City Comptroller and Treasurer, verified by the Mayor and the Finance Committees, and that not even for the payment of debts so stated and verified should the bonds be discounted — that in violation of its trust, the Fiscal Agent paid or gave out these bonds without haviDg the statement required, and at a loss by discount of twenty one and a half cents on the dollar, and for claims which were not, and viere not pretended to be, debts of the City of the *563 ■class specified, the Ordinance of July not authorizing these bonds to be given in payment of the Metropolitan Police apportionment, and the Finance Committees having no power or authority to make such destination of them — that even if these bonds could have been issued to pay that apportionment, not more than $537,940.28 of Metropolitan Police warrants were actually retired by the bonds, leaving the residue, viz $276,694.72 of bonds of the City outstanding, with all their coupons, for which the City has not received any consideration whatever.
The Bank, after filing exceptions which we think untenable, pleaded a general denial, and admitted that it had received as Fiscal Agent the bonds as charged, and averred that it was its duty bylaw to apply them according to the statement, prepared and verified by the City officers mentioned in the law, and that it did so apply them — that this statement was furnished by those officers to it, and that it purports to be a statement of the indebtedness of the City, as required by the Act of February 27 1869, and includes among that indebtedness the apportionment for the Metropolitan Police — that in addition to this statutory direction for the application of tile bonds, the Ordinance of the City Counoil reiterated the same direction, and in obedience to both of these mandates, the Fiscal Agent gave to Dubuclet, the Treasurer of the State, the bonds in question at par and in full payment of the Metropolitan Police apportionment — that after the Bank had ceased to be the Fiscal Agent, it rendered its account to the City, shewing the disposition of the bonds made by it, which account was approved, and the residue of the two millions of bonds were delivered to its successor, and that the City has recognised its liability for the $805,000.00 of bonds by funding all or'a part of them under the law, known as the Premium Bond Plan. The Bank, then premising that the subsequent disposition of these bonds is none of its concern, informs the court and alleges that they have been disposed of, and did realize $537,940.28, which was applied to the retirement of the Metropolitan Police warrants, and prays judgment against the City for this sum. The Bank, in addition to all this, avers that after these bonds had been thus applied, the Metropolitan Police Board brought suit against the plaintiff to compel her to pay over to the Board the amount of the estimate and apportionment for that Pqlice, and the City set up in defence to that action, under the oath of her chief executive officer, that payment of that apportionment had been made by the delivery by her Fiscal Agent to the State Treasurer of $805,000.00 of these seven per cent, bonds, and that such delivery was a full payment and discharge of any and all liability on her part for and on account of such apportionment.
There can be no doubt that, under the law of February 1869, the City Comptroller and Treasurer should not have included the Metropo *564 litan police apportionment in the estimate they were required to make of the floating debt of the City, and the Mayor and Finance Committees should not have verified such statement. But they did it. All the officers of the City, whose statement or verification was required by the Act of the legislature, joined in signing the papers, prescribed with so much particularity. The General Assembly doubtless thought that the requirement of a concurrence of so many officers in preparing the statement of the City’s indebtedness, and of the concurrence of an additional number of different officers in verifying it, was such a safeguard as would under all circumstances protect the City against either wrong doing, or a misconception of the duty to be performed. The Act expressly makes it 'the duty of the Fiscal Agent to give out the bonds at par in payment of the debts of the City “ to the creditors mentioned in said statement,” and it cannot have been contemplated that the Fiscal Agent should have the right — much less, that it should be its duty — to> go behind a statement, the correctness of which was supposed to be insured by requiring it to pass under the inspection of such a crowd of officers, and to receive the signature of each of them.
These officers had included the Police apportionment in their statement and verification in spite of the prohibition of the Statute, under which they were acting, and in wilfull contempt of its peremptory mandate. Their act was wilfull, because it is apparent from their careful observance of other details in the law of February 1869, that they knew its requirements, and were studiously consulting it in order to comply with its directory provisions as to the officers who should make the statement, and those who should verify it, and they complied with these, and with the command that the bonds should be given out only at par, by inserting that proviso in the Ordinance of July 1869. They intended to comply with those requirements which gave form and appearance to the authorization for paying out the bonds, the more surely to accomplish the illegal purpose of having them paid out for a huge estimate of Police expenses, which was not a part of the then existing floating debt of the Oity. ¡
The Bank avers that under that verified statement of the City officers, it had no option but to pay bonds for the Police apportionment, and that it complied with the legal mandate to pay them out at par, and triumphantly points to the receipt of the State Treasurer, acknowledging the delivery of the bonds at par.
This last averment is not sustained by the record. The bonds were never delivered to the Treasurer. That officer pretended to have received them, and signed a paper on July 20,1869, formally acknowledging to have received them from the Fiscal Agent in full payment of the statement of the Police assessment, whereas in truth the bonds were never *565 in his possession. Worse still, the bonds were not then in the possession of the Fiscal Agent. The formal receipt of A. Dubuclet, signed as State Treasurer, professing to have received from the Southern Bank this large amount of bonds, which the one did not have and the other therefore could not take, was but a bunglingly performed feat of legerdemain, wherein an object not in one place is made to appear to pass from it into another place, to the great delight of the audience of City officers who witnessed, and with ready, complaisance applauded this ill-concealed trick of sleight of hand.
While the object and nature of this paper transfer is abundantly shewn, and indicates great carelessness on the part of the Fiscal Agent, the record fails to establish its mala fides. Holding then that it could not refuse to give out the bonds upon the verified statement of the City officers, this mode of putting them under the control of the State Treasurer, although reprehensible, is not fatal to its defence. And this the more, since we find that after it had ceased to be the Fiscal Agent of the City, it rendered an account of its gestión to the plaintiff, (which necessarily included the whole transaction relative to the giving out of these bonds) and that the plaintiff approved and ratified the defendant’s act. Such ratification was clearly within the City’s power to make, since she had the power, through certain designated officers, to order the doing of the act which was subsequently ratified. We lay no stress on the fact that a recognition of these Bonds was made by providing for funding them in Premium Bonds. The bonds were out, and the City was assumed to be liable for them. That liability constitutes the ground for this suit to recover their amount from those who are charged with unlawfully putting them out. And besides, after the plaintiff knew of, and had ratified the manner of putting her bonds out, even assuming that her Fiscal Agent had misapplied them, and when she in turn was sued by the Police Board, in order to relieve herself of liability for the apportionment of §805,635.00, she pleaded in defence that she had paid it by her Bonds for a fraction less than that sum, and that she was forever acquitted and discharged of the debt. It is a judicial declaration that binds her.
The plaintiff’s counsel seeks to draw a distinction between the City government then and now, and would have us disregard and ignore the acts and declarations of its officers at the period when these things were done. We cannot assume that those acts were not her will then. She speaks and acts only through her accredited servants, and if she has had bad servants, she suffers from their maladministration as an individual often suffers from the unfaithfulness of his agents; and as an individual would be bound by his ratification of a wrongful act of his agent, for which responsibility did not attach when it was done, so a *566 corporation.must in like manner be bound by its ratification. The plaintiff condoned the malfeasance, if there were any — adopted the acts of her Fiscal Agent and made them her own, and screened herself from an alleged liability to a party professing to have been injured, by pleading those acts as a virtuous discharge of her obligation. She is estopped from recovering of the Bank now.
The defence of Dubuclet is of a wholly different kind. He was the-Treasurer of the State, and liis acts relating to this matter were official.
The Metropolitan Police Act-put in motion machinery, ingeniously contrived to strangle local corporate government. It substituted centralized autocratic domination to the exercise of corporate powers for local regulation. The parishes of Orleans, Jefferson, and St. Bernard; were territorially united for the purposes of police government and police discipline into one district, and the powers and duties connected with, and incident to that government and discipline, were vested in a. board of commissioners, who were to be appointed by the Governor of the State, and who were to appoint one of themselves to be treasurer of the Police District thus formed, which treasurer was to receive from the State Treasurer the moneys belonging to the Police Fund. Sess. Acts-1868, p. 85. Thus the Treasurer of the State was brought in connection with this organization.
The defence of Dubuclet is, that the cause of action set forth in the plaintiffs petition arises ex delicto, and is barred by the prescription of one year.
There is no pretence that the action is founded on any contract between the State Treasurer and the City, nor can there be; that it is founded on a quasi-contract. This latter is the lawful and purely voluntary act of one from which there results any obligation whatever to a third person. Civil Code, art. 2272 new no. 2298.
Pothier defines an offence to be un fait par lequel une personne, par vol ou malignité, cause du dommage ou quelque tort a une autre, and a quasi-offence to be le fait par lequel une personne, sans malignité mais par une imprudence qui n’est pas excusable, cause quelque tort a une autre. The characteristic therefore of offence or quasi-offence is-that the act, from which the obligation arises, is unlawful. The marked distinction then between a quasi-contract, and an offence or quasi-offence is, that the act which gives rise to a quasi-contract is a lawful act and therefore is permitted; while the act which gives rise to an offence or quasi-offence is unlawful, and 'therefore is forbidden. The Pandects clearly draw the line of distinction between contracts and delicts; — Ex maleficio nascuntur ohligationes, veluti ex furto, ex damno, ex rapiña, ex injuria, guce omnia unius generis sunt; nam hac re tantum consisiunt, iá *567 est ipso maleficio, quum alioquin ex contractu obligaiiones non tantwm re consistunt, sect etiam verbis et consensu. Dig. L. 44 Tit. 7 sec. 4.
The distinction between damages ex delicto and ex contractu is, that the latter ensue from the breach of a special obligation, and the former from the violation of a general duty. Marcade says; — Remarquons bien que c’est de la violation d’un devoir proprement dit qu’il s’agit, d’un de ces devoirs gónéraux existant au profit de toutes personnes, et non pas de la violation du devoir existant spócialement de telle personne determinée a. telle autre determinée, et qui constitue l’obligation. Explic. du Code Napoleon art. 1382.
Applying this test to the plaintiff’s petition, it is apparent that the alleged responsibility of the State Treasurer is for an offence or quasioffence, and that the damages resulting therefrom are necessarily ex delicto, and the action therefor is prescribed in one year. Oivil Code, art. 3501 new no. 3536. It must be observed that Dubuclet was to receive only money — to be- raised by taxation, says the Act — and he did not receive money, but bonds, and his act was therefore unlawful, and is an offence or quasi-offence.
And the rule applies to ministerial officers as well as to individuals. This court said in Semple v. Buhler, 6 Mart. N. S. 665; — the law makes no distinction in this respect between public ministerial officers and private individuals, and we ought not to distinguish, and werh we at liberty to do so, it would be difficult to find any good reason for imposing a heavier responsibility on a public than a private agent. And this was reiterated in Edwards v. Turner, 6 Rob. 382, Emmerling v. Graham, 14 Annual, 389, Taylor v. Graham, 15 Annual, 418.
It is ordered, adjudged, and decreed that the verdict of the jury is set aside, the j udgment of the lower court is avoided and reversed as to these two defendants, and that there be now judgment in favor of the Southern Bank against the plaintiff upon the demand set up herein, and that there be judgment in favor of A. Dubuclet sustaining his plea of prescription, and that these defendants recover of the plaintiff the costs of appeal.